IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

MONICA THERESA BRYANT,    )    Case No. 3:19-cv-0079
    )
    Plaintiff,    )    MAGISTRATE JUDGE
    )    THOMAS M. PARKER
    v.    )
    )
COMMISSIONER OF    )    **MEMORANDUM OF OPINION**
SOCIAL SECURITY,    )    **AND ORDER**
    )
    Defendant.    )

**I.**    **Introduction**

Plaintiff, Monica Theresa Bryant, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g) and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 17.  Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Bryant's application for SSI must be AFFIRMED.

**II.**    **Procedural History**

On July 13, 2015, Bryant protectively applied for SSI.  (Tr. 288-305).[1]  Bryant alleged that she became disabled on December 3, 2014 due to fibromyalgia, degenerative disc disease and spinal stenosis.  (Tr. 226-231, 272).  The Social Security Administration denied Bryant's

---

[1] The administrative transcript is in ECF Doc. 19.

application initially and upon reconsideration.  (Tr. 98-105).  Bryant requested an administrative hearing.  (Tr. 106).  ALJ Carrie Kerber heard Bryant's case on November 8, 2017, and denied the claim in a February 28, 2018, decision.  (Tr. 9-65).  On September 24, 2018, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-5).  On November 20, 2018, Bryant filed a complaint challenging the Commissioner's decision.  ECF Doc. 1.

## III.    Evidence

### A.    Personal, Educational and Vocational Evidence

Bryant was born on November 10, 1974 and was 42 years old at the time of the administrative hearing.  (Tr. 35).  She graduated from high school and earned a master's degree in community counseling.  (Tr. 36).  In the past, she had worked as an inventory clerk, a paralegal and a counselor.  (Tr. 60).

### B.    Relevant Medical Evidence

Bryant saw neurologist, Dr. Robert McLain, at the Cleveland Clinic on April 14, 2014. She reported that her orthopedic spine surgeon told her she needed thoracic disc surgery.  (Tr. 432).  A thoracic spine MRI on April 15, 2014 showed a focal midline disc extrusion at T6-7 causing minimal impression on the ventral cord without significant central canal narrowing and multilevel mild degenerative changes, most notably at T9-10 where facet hypertrophy was causing mild impression on the dorsolateral cord.

On June 27, 2014, Bryant returned to Cleveland Clinic complaining of pain in her thoracic spine with constant tingling in both legs and muscle spasms in her anterior thighs.  She saw Dr. Ajit Krishnaney who found she had no "surgically amenable lesion."  (Tr. 398).

Bryant saw Dr. Rebecca Kuenzler on July 28, 2014 and reported ongoing sensory symptoms and cramps in her legs and feet, which had grown worse since her cervical surgery in

2013. (Tr. 395-396). She reported falling a lot and dropping objects. She also reported pain in her thoracic spine. (Tr. 396). Bryant also saw Dr. Augusto Hsia on July 28, 2014. He diagnosed chronic thoracic pain and significant myofascial pain. (Tr. 392-394). Dr. Hsia saw Bryant again on November 28, 2014 and diagnosed chronic spine pain, chronic bilateral circumferential leg pain and multiple somatic complaints. Dr. Hsia requested a second opinion from rheumatology for myalgia, "fms like symptoms." (Tr. 385-388).

Bryant saw Dr. Soumya Chatterjee in the rheumatology clinic at the Cleveland Clinic on January 27, 2015. Dr. Chatterjee found that plaintiff met the ACR criteria for fibromyalgia. Dr. Chatterjee also diagnosed fatigue, myalgia, myelodysplastic syndrome, thoracic spondylosis, and hypersensitivity disorder. (Tr. 385).

Bryant returned to see Dr. Hsia on February 27, 2015. She was feeling the same except her leg pain was better with Cymbalta. (Tr. 377). Dr. Hsia observed palpable muscle spasm and/or tenderness in the thoracic spine, with decreased flexion and extension of the lumbar spine. He diagnosed chronic thoracic pain, myofascial/fibromyalgia syndrome, and thoracic degenerative disc disease. (Tr. 378).

When Dr. Hsia saw Bryant on June 19, 2015, he noted that her posture and spinal curves were abnormal. She had increased thoracic kyphosis and paraspinal, cervical, thoracic and lumbar tenderness. (Tr. 447).

Physical therapist, Karin Kleppel, evaluated Bryant and completed a functional capacity evaluation on August 18, 2015. (Tr. 569). Ms. Kleppel opined that the results of the test were inaccurate because Bryant had exerted less than her maximum voluntary effort. (Tr. 577).

On October 29, 2015, Dr. Chatterjee noted that Bryant's fibromyalgia-related pain had not improved and was likely exacerbated by her stress, mood, allergies and persistent back pain. (Tr. 610-611).

Bryant reported she was feeling worse when she saw Dr. Hsia on November 23, 2015. Her mid-back pain worsened with prolonged sitting. (Tr. 639). A thoracic MRI on November 30, 2015 showed small central disc protrusions at T6-7 and T12-L1 contacting the ventral cord but causing no cord displacement. (Tr. 647).

Dr. Hsia referred Bryant to Dr. Shrif Costandi for a chronic pain consultation. Bryant saw Dr. Costandi on February 18, 2016. She reported longstanding pain in her mid/lower back, radiating to the right lower extremity, with tingling as well in the left lower extremity. She reported that her symptoms interfered with walking, sleeping, sitting, driving, lifting and were exacerbated by sitting, standing, and walking. (Tr. 671). Dr. Costandi diagnosed thoracolumbar and lumbosacral spondylosis. He recommended physical therapy and considered a psychological consultation. (Tr. 675). Bryant returned to see Dr. Costandi on July 5, 2016. Dr. Costandi continued to recommend physical therapy despite noting that Bryant had failed to respond to it, aquatherapy and/or medications in the past. (Tr. 666).

A lumbar spine MRI on July 20, 2016 showed congenital central canal stenosis with superimposed spondylosis; a right paracentral annular tear and protrusion at L1-L2 impinging on the traversing right L2 nerve root; a central annular tear at L2-L3; a left eccentric disc bulge at L3-L4 narrowing the left lateral recess and neural foramen, potentially slightly impinging the traversing left L4 nerve root and displacing the exited component outside the neural foramen of the L3 nerve root; a central annular tear and small protrusion at L4-L5; and a central protrusion extending into lateral recesses bilaterally and displacing the traversing bilateral S1 nerve root without impingement or compression. (Tr. 681).

Bryant began treating with Dr. Cooper, the consulting examiner, on April 20, 2016. (Tr. 737). On July 21, 2016, Dr. Cooper diagnosed multi-level lumbar spinal stenosis with radiculopathy. (Tr. 732-734).

Dr. Cooper referred Bryant to Dr. Hossein Elgafy, who saw her on July 22, 2016. (Tr. 837). Physical examination showed lumbar pain with flexion and extension, as well as midline, paraspinal, and sacroiliac tenderness. (Tr. 839). Lumbar x-rays showed mild disc space narrowing at L2-L3 and L5-S1. (Tr. 844). Dr. Elgafy diagnosed spinal stenosis of lateral region of lumbar spine. (Tr. 839). Bryant returned to see Dr. Elgafy on June 29, 2016, with a copy of her recent MRI. Dr. Elgafy added the diagnosis of prolapsed lumbar intervertebral disc. (Tr. 834-836).

On August 11, 2016, Bryant saw Dr. Joseph Atallah. Dr. Atallah noted that Bryant had failed four weeks of non-surgical, non-injection care. (Tr. 829, 831). Examination showed tenderness of the spinous process at L4, the transverse processes on the right and left at L5, the sacral promontory, the sacrum and the supraspinous ligament and paraspinal region at L5. Range of motion was limited in all planes. Motor strength was reduced to 4/5 in the right knee extension quadriceps, ankle dorsiflexion anterior tibialis, and right great tow extensor hallucis longus. Ankle reflexes were diminished bilaterally, and Patrick-Fabere and supine straight leg raising tests were positive on the right. (Tr. 832). Dr. Atallah diagnosed spinal stenosis at L3-L4, lumbosacral stenosis without myelopathy, thoracic spondylosis, lumbar radiculopathy, and inflamed sacroiliac joint. (Tr. 831). Dr. Atallah recommended steroid injections, but they were rejected by Bryant's insurance company. (Tr. 827).

On August 18, 2016, Bryant reported to Dr. Cooper that she was still experiencing chronic pain in her mid to low back. She also had dyesthesia [*sic*] in both legs that caused frequent tripping. (Tr. 731). Dr. Cooper opined that Bryant was unable to sit longer than one to one and a half hours and could not lift more than 10 pounds. (Tr. 730).

On October 18, 2016, Bryant returned to see Dr. Atallah, reporting severe low back pain with intermittent bilateral S1 and L3-L4 radiculopathy. (Tr. 826). Dr. Atallah diagnosed spinal

stenosis of the lumbar region and lumbar radiculopathy. He planned to ask the insurance company to reconsider injections, which were apparently approved. (Tr. 827). He performed spinal pain block and lumbar epidural steroid injections on January 24, 2017 and February 7, 2017. (Tr. 846-849).

Bryant saw Dr. Atallah again on April 5, 2017. Her lower back pain was not radiating as it had been prior to her injections. (Tr. 817). Dr. Atallah noted positive thoracic findings and wanted to perform a medial branch block of her thoracic spine as well. (Tr. 817-818). Bryant received these injections to her thoracic spine on May 24, 2017 and May 31, 2017. She also had a lumbar median branch block on May 31, 2017. (Tr. 842-843, 850-853).

Bryant saw Dr. Cooper on June 9, 2017. (Tr. 760-762). She reported that her sciatica and back pain had only temporarily improved after recent injections. (Tr. 762). Bryant saw Dr. Atallah again on June 27, 2017. He diagnosed sacroiliac joint pain and thoracic spondylosis without myelopathy. (Tr. 809).

### C. Relevant Opinion Evidence

#### 1. Consultative Examiner – Marsha Cooper, M.D. – December 2015

On December 4, 2015, Dr. Marsha Cooper evaluated Bryant at the request of the state agency. At the time of the evaluation, Dr. Cooper was not Bryant's treating physician. Dr. Cooper reported a normal neurologic examination with normal motor and muscular findings. Bryant's gait was normal without assistive device. Her reflexes, hand grips, manual dexterity, coordination, balance and Romberg's balance test were all normal. She observed very minimal scoliosis. Dr. Cooper opined that Bryant was not disabled from all work. She opined that she was capable of clerical type jobs and had the education to do that work. Dr. Cooper did, however, note that Bryant should avoid jobs that required lifting above the shoulders due to previous neck issues and surgery. (Tr. 660-663).

## 2.     State Agency Consultants

On September 5, 2015, state agency consultant, Paul Morton, M.D., reviewed Bryant's medical records and opined that Bryant could lift up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk for up to 6 hours in an 8-hour workday; and sit for up to 6 hours in an 8-hour workday. (Tr. 74-75). He opined that Bryant was limited in her ability to push and/or pull with both of her legs. Dr. Morton found that Bryant could only occasionally climb ramps or stairs, stoop, kneel, or crawl, but could frequently crouch. He opined that she could never climb ladders, ropes or scaffolds, and would need to avoid concentrated exposure to hazards such as dangerous machinery and unprotected heights. (Tr. 75).

On January 8, 2016, Dr. Michael Lehv reviewed Bryant's records and generally agreed with the opinions of Dr. Morton. However, he opined that Bryant was limited to standing and walking for only four hours in an eight-hour workday, rather than six. He also opined that she would need to periodically alternate between sitting and standing and should avoid overhead reaching. (Tr. 91-96).

## D.     Relevant Testimonial Evidence

Bryant testified at the administrative hearing on November 8, 2017. (Tr. 35-59). Bryant was 5'8" tall and weighed 200 pounds. (Tr. 35). She last worked as a licensed professional counselor. She worked at that full-time job for a year. It required a lot of driving because she visited residents in nursing homes throughout Cincinnati. (Tr. 37). She had to lift a 25-30 pound suitcase in and out of her car when she visited the nursing homes. (Tr. 38). She also previously worked as a paralegal and in a factory taking inventory of small parts. (Tr. 39-41).

Bryant said she could not work due to the effects of spinal stenosis, fibromyalgia, degenerative disc disease and arthritis throughout her spine. (Tr. 42). She did not sleep well due to constant pain. (Tr. 42). She normally went to bed around 10:00 or 10:30 p.m. and got up at

7:00 a.m.  During that time, she woke up every couple of hours to change positions.  It would take her five to ten minutes to reposition and go back to sleep.  She would wake up feeling sore and tired.  (Tr. 45).  She sometimes would sleep for an hour in the afternoon.  (Tr. 46).  She spent much of her day lying down on her side.  (Tr. 44).  She typically was "up and moving around" for an hour or two.  However, her legs would feel heavy and her feet would tingle if she was on her feet too much.  (Tr. 44).  The medications that Bryant was taking did not cause any side effects.  She had previously received injections for her back pain, and they helped for about eight weeks but only in the location of the injection.  (Tr. 48, 53).

Bryant lived with her autistic 11-year old son.  (Tr. 36).  He was high-functioning and home-schooled with a virtual public school.  (Tr. 44).  He took care of his own personal and hygiene needs.  Bryant helped him with washing his hair.  (Tr. 46-47).  If he had problems with school, he would bring his laptop computer and ask Bryant for help while she lay down.  Her son helped her with laundry.  (Tr. 44).

Bryant enjoyed reading.  She could do household chores if she worked slowly and for fifteen minutes at a time.  However, she could not vacuum anymore and was unable to do lawn work.  (Tr. 49-50).  She went shopping twice a month.  Her son helped her carry in the groceries.  She was able to lift a gallon of milk.  (Tr. 50).  She was able to walk for about 10 minutes.  (Tr. 51).  She had previously used a cane and a walker due to frequent falls before her neck surgery.  (Tr. 51-52).  She used the walker for about six months.  (Tr. 52).  She had more balance problems before her neck surgery but continued to feel dizzy with too much physical exertion.  (Tr. 56-57).

Vocational Expert John Finch ("VE") also testified at the hearing.  (Tr. 59-65).  He considered Bryant's past work to be inventory clerk, paralegal and counselor.  (Tr. 60).  The VE first considered a hypothetical individual of Bryant's age, education and vocational background

who could perform a full range of light work except she was limited to standing and walking a total of four hours in an eight-hour workday with the ability to alternate positions every 30 minutes; she could frequently push and pull with her lower extremities; could occasionally climb ramps and stairs, but no ladders ropes or scaffolds; she could occasionally stoop, kneel and crawl; frequently crouch; could not reach overhead; and could not be exposed to workplace hazards such as moving machinery and unprotected heights. (Tr. 60-61). The VE opined that this individual could do Bryant's past work of paralegal as performed, but not as it is classified in the *DOT*. She could also do Bryant's counseling work as classified, but not as performed. (Tr. 61). The VE's opinion remained the same if the individual's exertion level was limited to sedentary. The VE further opined that this individual would also be able to work as a document preparer, a charge account clerk and an order clerk. If the individual was limited to simple tasks that are not fast-paced, she would not be able to perform any of Bryant's past jobs, but she would be able to perform the other jobs listed by the VE. (Tr. 62).

The VE opined that employers do not permit lying down during the workday. They will tolerate up to 8% of off-task time and one absence per month. (Tr. 63).

## IV.    The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

2.  Bryant had the following severe impairments: congenital spinal stenosis of the cervical, thoracic and lumbar spine, status post cervical decompression; and fibromyalgia. (Tr. 14).

4.  Bryant had the residual functional capacity to perform sedentary work except she could stand/walk for a total of four hours in an eight-hour workday with the ability to alternate positions every 30 minutes; she could frequently push and pull with her lower extremities; occasionally climb ramps and stairs but could not climb ladders, ropes or scaffolds; she could occasionally stoop, kneel and crawl; frequently crouch; could not reach overhead; and could not be exposed to hazards such as moving machinery and unprotected heights; she was limited to work that is not fast-paced. (Tr. 15-16).

9.  There were jobs that existed in significant numbers in the national economy that Bryant could perform.  (Tr. 21).

Based on all her findings, the ALJ determined that Bryant had not been under a disability from July 13, 2015, the date her application was filed.  (Tr. 22).

## V.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or reweigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion.  42 U.S.C. §§ 405(g), 1383(c)(3); *see also Elam*, 348 F.3d at 125 ("The decision must be affirmed if . . . supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record.").  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if supported by substantial evidence, however, the court will not uphold the Commissioner's decision when the Commissioner failed to apply proper legal standards, unless

the error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). Although it is the Commissioner's obligation

to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. §§ 404.1512(a), 416.912(a).

**B.      Medical Opinion Evidence**

Bryant argues that the ALJ erred in relying upon and giving partial weight to the opinions of the state agency reviewing physicians because their opinions were based on a very limited review of the record. Dr. Morton reviewed Bryant's records in September 2015 and Dr. Lehv reviewed her records in January 2016. Bryant contends that the ALJ based her RFC findings on the opinions expressed by Dr. Morton and Dr. Lehv. Bryant points out that much of the medical evidence in the record was developed after those reviews were completed. Because these physicians did not review her complete record, Bryant argues that the ALJ should not have relied on their opinions. ECF Doc. 20 at 11-12.

At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives. 20 C.F.R. §§ 404.1527(c), 416.927(c).[2] An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). Here, there were no formal opinions from treating physicians and Bryant's argument is not related to a treating source. Rather, she argues that the ALJ erred in how she assessed the state-agency reviewing physicians' opinions.

"[O]pinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'" *Gayheart*, 710 F.3d at 376. Instead, an ALJ must weigh such opinions based on: (1) the examining relationship; (2) the degree to which supporting explanations

---

[2] 20 C.F.R. §§ 404.1527, 416.927 applies to Bryant's claims because she filed them before March 27, 2017.

consider pertinent evidence; (3) the opinion's consistency with the record as a whole; (4) the physician's specialization related to the medical issues discussed; and (5) any other factors that tend to support or contradict the medical opinion. *Id.*; 20 C.F.R. §§ 404.1527(c), 416.927(c). Generally, an examining physician's opinion is due more weight than a nonexamining physician's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Gayheart*, 710 F.3d at 375. An ALJ does not need to articulate good reasons for the weight assigned to a nontreating or nonexamining opinion. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (declining to address whether an ALJ erred in failing to give good reasons for not accepting non-treating physicians' opinions). An ALJ may rely on a state agency consultant's opinion and may give it greater weight than other nontreating physician's opinions if it is supported by the evidence. *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 274 (6th Cir. 2015).

Regarding the opinions of the state agency reviewing physicians, the ALJ stated:

A state agency medical consultant, upon review of the evidence of record, initially determined that the claimant can perform light work, with frequent pushing and pulling with her lower extremities; no climbing of ladders, ropes and scaffolds; occasional climbing of ramps and stairs, stooping, kneeling and crawling; frequent crouching; and no concentrated exposure to hazards. (1A). A subsequent consultant generally agreed, but indicated standing and walking four hours in an 8-hour day more appropriate, and the claimant must periodically alternate sitting and standing and should avoid reaching overhead. (3A). These opinions have been given partial weight, particularly with regard to the postural limitations, the standing and walking described in the latter opinion, and the need to alternate sitting and standing. However, the evidence as a whole, including Dr. Cooper's and Ms. Kleppel's reports, shows the claimant cannot perform more than sedentary work. In light of the claimant's testimony to concentration difficulties due to pain and fibromyalgia, the undersigned further finds that a limitation on work pace is warranted. An individual's symptoms, including pain, can cause limitations or restrictions that are classified as exertional, non-exertional, or a combination of both.

(Tr. 20). The ALJ did not simply adopt the opinions of the state agency reviewing physicians in this case. Rather, she assigned partial weight to their opinions, explained her reasoning and actually found that Bryant's RFC was more limited than the state-agency physicians' opinions.

In reaching this conclusion, the ALJ applied proper legal standards in weighing the medical opinion evidence. 42 U.S.C. §§ 405(g), 1383(c)(3). She was not required to articulate good reasons for her decision regarding the state agency reviewing physicians' opinions, but she did. And, the fact that the state agency reviewing physicians' opinions were based on a partial review of Bryant's records did not automatically invalidate their opinions. There is no "categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record. The opinions need only be 'supported by evidence in the case record.'" *Helm v. Comm'r of Soc. Sec.,* 405 F. App'x 997, 1002 (6th Cir. 2011).

Interestingly, Bryant doesn't argue that the opinions of the state agency reviewing physicians were wrong or unsupported by substantial evidence. Nor does she argue that there was evidence in the record undermining their opinions. She lists some evidence the state agency physicians did not review, but she doesn't explain how the availability of this evidence when the record was reviewed might have changed their opinions. ECF Doc. 20 at 11. Rather, she argues that their opinions should have been rejected simply because they did not review a full record. As recognized in *Kelly v. Comm'r of Soc. Sec.,* 314 F. App'x 827, 831 (6th Cir. 2009), "there will always be a gap between the time the agency experts review the record and give their opinion . . . and the time the hearing decision is issued. Absent a clear showing that the new evidence would render the prior opinion untenable, the mere fact that a gap exists does not warrant the expense and delay of judicial remand." Bryant has made no such showing.

Here, the ALJ thoroughly reviewed the record and explained her decision including the weight assigned to the opinions of the state agency physicians. There is no basis upon which this court could conclude that an updated evidence review would have changed the state agency physicians' opinions. Indeed, the later-developed evidence did not show a decline in Bryant's

ability to function (at least, Bryant has not cited any records that showed such a decline).

Bryant's argument – that the ALJ erred in relying on the opinions of the state agency reviewers because they reviewed less than a complete record – is contrary to applicable law and not well taken. The ALJ applied proper legal standards in evaluating the opinions of the state agency reviewing physicians, and her decision may not be upset based on Bryant's argument on this point.

### C.    Fibromyalgia and Subjective Symptom Complaints

Bryant contends that the ALJ erred by discrediting her fibromyalgia-related complaints as not supported by objective medical evidence even though she found Bryant's fibromyalgia to be a severe impairment. Bryant argues that fibromyalgia is often not accompanied by objective medical evidence. Despite this, the ALJ discounted Bryant's fibromyalgia complaints because of the lack of objective evidence. Bryant points to several sections of the ALJ's decision noting the absence of objective findings. Bryant argues that the ALJ erred by focusing on the lack of objective evidence when considering her fibromyalgia complaints. ECF Doc. 20 at 13-14.

The ALJ must determine a claimant's RFC by considering *all* relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an assessment of a claimant's ability to do work despite her impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). An ALJ is not required to accept a claimant's subjective symptom complaints, however, and may properly discount the claimant's testimony about her symptoms when it is inconsistent with objective medical and other evidence. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003); SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017) ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence."). In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate her symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and restrictions. SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).

Ordinarily, a claimant must substantiate her pain complaints by citing objective medical evidence that her medical condition: (1) actually caused severe pain; or (2) is so severe that it would be reasonably expected to cause the alleged pain. *Blankenship*, 874 F.2d at 1123 (citing *McCormick v. Sec'y of Health & Hum. Servs.*, 861 F.2d 998, 1003 (6th Cir. 1988), and *Duncan v. Sec'y of Health & Hum. Servs.*, 801 F.2d 847 (6th Cir. 1986)). However, such objective evidence is often unavailable when fibromyalgia is the underlying condition. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007); *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003) (noting that, due to the "elusive" and "mysterious" nature

of fibromyalgia, medical evidence confirming the alleged severity of the impairment almost

never exists).  When the severity and limiting effects of fibromyalgia pain cannot be confirmed

by objective medical evidence, the ALJ must:

> consider all of the evidence in the case record, including the [claimant's] daily
> activities, medications or other treatments the [claimant] uses, or has used, to
> alleviate symptoms; the nature and frequency of the [claimant's] attempts to
> obtain medical treatment for symptoms; and statements by other people about the
> [claimant's] symptoms.

SSR 12-2p, 2012 SSR LEXIS 1 *14 (Jul. 25, 20112).  Here, the ALJ did just that.

The ALJ applied proper legal standards and reached a conclusion supported by

substantial evidence in evaluating Bryant's subjective symptom complaints and determining her

RFC.  42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125.  The ALJ's decision

demonstrates that she considered Bryant's subjective complaints in determining the RFC:

> In recognition of the fact that an individual's symptoms can sometimes suggest a
> greater level of severity of impairment than can be shown by the objective
> medical evidence alone, the undersigned has also considered other evidence in
> assessing the consistency of the claimant's statements regarding her limitations
> and restrictions.  One of these factors is the individual's daily activities.  Among
> other factors are the location, duration, frequency and intensity of the individual's
> pain or other symptoms, and the type, dosage, effectiveness and side effects of
> medications the individual has taken to alleviate pain or other symptoms.  (*See* 20
> C.F.R. 426.929).
>
> In this instance, however, the above factors are not probative of disability.  The
> claimant's daily activities include being the primary caregiver of a child with
> special needs, including home schooling that child (testimony of claimant).
> Although she testified that he is essentially home schooling himself, the
> undersigned does not find it persuasive that an 11-year-old with special needs is
> doing so without significant parental involvement.  The claimant's testimony that
> she does very limited household chores is only out of bed a few hours at a time is
> also unpersuasive, in light of her testimony that she does not receive any outside
> help with those tasks.
>
> With regard to her treatment, the claimant has not required further neck surgery or
> back surgery during the time at issue.  The record reflects only minimal physical
> therapy, although it has been recommended several times.  Her current treatment
> consists primarily of undergoing periodic injections, and the fact that she has
> returned for these procedures multiple times (21F, 23F) tends to indicate they are
> effective.  She is not taking narcotic-strength pain medications (28E), and the

record indicates she had even stopped taking her medications at one point (12F/14-15). As noted at Finding 2, the claimant has reported being depressed, but the record does not show that she has undergone any treatment for those symptoms. The level of treatment reflected in the record is not consistent with the claimant's allegations regarding her objective clinical findings upon repeated examinations throughout the record, which have been relatively mild, as discussed in detail above.

(Tr. 20-21).

The ALJ complied with the regulations by: (1) recognizing that Bryant's symptoms may not be fully supported by objective medical evidence; (2) considering all of her impairments – including her fibromyalgia – in light of the medical and other evidence in the record; and (3) clearly explaining that she rejected Bryant's subjective symptom complaints because her testimony concerning the intensity, persistence, and limiting effects of her symptoms was not consistent with her daily activities, the conservative treatment she sought *and* the medical evidence. 20 C.F.R. §§ 404.1520(e), 404.1529(c)(3), 416.920(e), 416.929(c)(3); SSR 96-8p, 1996 SSR LEXIS 5; SSR 16-3p, 2016 SSR LEXIS 4; SSR 02-1p, 2002 LESIS 1 at *18; *Felisky*, 35 F.3d at 1036; (Tr. 17-19).

Bryant complains that the ALJ misconstrued the facts. For example, she challenges the idea that she was more than a passive caregiver for her 11-year-old son, asserting that he was a high-functioning person with autism. ECF Doc. 20 at 16. Also, she challenges the ALJ's assertion that she never sought no help with household chores, pointing out that her son helped her. ECF Doc. 20 at 16. Essentially, Bryant disagrees with the ALJ's treatment of her testimony. But what Bryant asks the court to do, we may not do. We are not permitted to reevaluate the facts or reach different conclusions on how those facts should be characterized. As will be discussed further below, the court's role is to see whether the ALJ considered the facts. There can be no doubt that she did, including the very ones Bryant contends she misconstrued.

If an ALJ discounts or rejects a claimant's subjective complaints, she must state clearly her reasons for doing so. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). But, an ALJ's decision need not explicitly discuss each of the factors. *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as she acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)). Although the ALJ must discuss significant evidence supporting her decision and explain her conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all the information upon which she relied into a single paragraph. *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (6th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense").

Reading the ALJ's decision as a whole, she did not fail to consider evidence, rely only upon the objective medical evidence, cherry-pick the evidence, or play doctor. *Buckhannon*, 368 F. App'x at 678-79. Instead, she complied with the regulations and applicable Social Security Rulings by considering all the evidence in the longitudinal record, including the objective medical findings, Bryant's testimony regarding her symptoms and daily activities, her conservative treatment history, and the medical opinion evidence. 20 C.F.R. §§ 404.1520(e), 404.1529(c)(3), 416.920(e), 416.929(c)(3); SSR 96-8p, 1996 SSR LEXIS 5; SSR 16-3p, 2016 SSR LEXIS 4; SSR 02-1p, 2002 LESIS 1 at *18; (Tr. 15-21). And, to the extent the ALJ found Bryant's subjective complaints credible – *e.g.*, the effects of her pain on her ability to concentrate – the ALJ appropriately restricted Bryant's RFC, limiting her to work that was not fast-paced. (Tr. 15-16, 20). Substantial evidence supported the ALJ's conclusion that Bryant's subjective complaints were not entirely consistent with other evidence in the record. The ALJ's RFC

finding adequately accounted for Bryant's functional limitations.  42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125.

Because the ALJ applied proper legal standards in evaluating Bryant's subjective symptom complaints and in determining Bryant's RFC, and because her conclusions were supported by substantial evidence, the ALJ's decision fell within the Commissioner's "zone of choice" and must be affirmed.  42 U.S.C. §§ 405(g), 1383(c)(3); *see also Elam*, 348 F.3d at 125; *Jones*, 336 F.3d at 476; *Rogers*, 486 F.3d at 241; *Mullen*, 800 F.2d at 545.

### D.  Bryant's Ability to Sit and Stand for Sustained Periods

On August 18, 2016, Bryant saw Dr. Cooper, her consultative examiner-turned-treating physician.  (Tr. 730).  Dr. Cooper's office notes from August 18, 2016 stated that Bryant was "unable to sit longer than 1 to 1 and ½ hrs nor lift more than 10 lbs."  Bryant argues that the ALJ's RFC is incorrect because she found that Bryant would need to change positions every 30 minutes and could only stand for four hours.  Bryant argues that, if the 1 and ½ hours that Dr. Cooper opined Bryant could sit are added to the 4 hours that the ALJ found she could stand, the total is less than a full 8-hour workday.  ECF Doc. 20 at 15.

Bryant is correct in noting that SSR 96-8, 1996 SSR LEXIS 5, provides that "ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  *Id.*  The problem with Bryant's argument is that Dr. Cooper's August 18th note did not state that Bryant could sit for a total of 1 and ½ hours *per day.*  Rather, it said that Bryant could sit no longer than 1 and ½ hours. This distinction is significant here because the note, as written, does not necessarily support Bryant's argument.

The ALJ's decision specifically addressed the ambiguity in Dr. Cooper's August 18th note:

> However, based upon her imaging studies, Dr. Cooper concluded the claimant is unable to sit longer than an hour to an hour-and-a-half or lift more than 10 pounds (*Id.*). This evidence has also been given some weight. The restrictions described by Dr. Cooper are accommodated by the assessed residual functional capacity for no more than sedentary lifting, with the allowance to change positions about every 30 minutes.

(Tr. 20). The ALJ considered Dr. Cooper's opinion, assigned weight to it and incorporated its limitations into her RFC finding. The ALJ was not required to limit Bryant's *total* sitting to 1 and ½ hours per day based on Dr. Cooper's August 18th note. Bryant's argument that the ALJ did not properly account for her sustained ability to do work is not supported by the very record on which she relies for support.

### E.    ALJ's Finding Regarding Bryant's Activities of Daily Living (ADL)

Finally, Bryant argues that the ALJ's finding - that her activities of daily living were inconsistent with her claim – was not supported by substantial evidence. ECF Doc. 20 at 15-16. Specifically, Bryant argues that the ALJ improperly found that her statements regarding caring for her 11 year-old son and not doing household chores were "unpersuasive." ECF Doc. 20 at 15-16. (Tr. 20).

The ALJ's assessment of symptoms, formerly referred to as the "credibility" determination in SSR 96-7p, 1996 SSR LEXIS 4, was clarified in SSR 16-3p, 2016 SSR LEXIS 4 to remove the word "credibility" and refocus the ALJ's attention on the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." SSR 16-3p, 2016 SSR LEXIS 4, 2017 WL 5180304 at *2 (October 25, 2017) (emphasis added). The new ruling emphasizes that "our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation." See 2016 SSR LEXIS 4,[WL] at *11. Under SSR 16-3p, 2016 SSR

LEXIS 4, an ALJ is to consider all of the evidence in the record in order to evaluate the limiting effects of a plaintiff's symptoms, including the following factors:

    1. Daily activities;

    2. The location, duration, frequency, and intensity of pain or other symptoms;

    3. Factors that precipitate and aggravate the symptoms;

    4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

    5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

    6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

    7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*Id.,* 2016 SSR LEXIS 4, 2017 WL 5180304, at *7-8; see also 20 C.F.R. §§ 404.1529(c), 416.929(c) and former SSR 96-7p, 1996 SSR LEXIS 4.  As already indicated above, the ALJ considered a number of these factors including Bryant's ADL's, the medications she used and the conservative treatment she received.  (Tr. 20-21).

    Even after SSR 16-3 clarified the rules concerning subjective symptom evaluation and removed the term "credibility" from the regulations, the procedures for reviewing an ALJ's credibility assessment under SSR 16-3p, 2016 SSR LEXIS 4 are substantially the same as the procedures under SSR 96-7p, 1996 SSR LEXIS 4.  *Delong v. Comm'r of Soc. Sec.,* No. 2:18-cv-368, 2019 U.S. Dist. LEXIS 16167 (S. D. Ohio, Feb. 1, 2019).  Therefore, courts agree that the prior case law remains fully applicable to the renamed "consistency determination" under SSR 16-3p, 2016 SSR LEXIS 4, with few exceptions.  *Whicker-Smith v. Comm'r of Soc. Sec.,* No. 1:18-cv-52. 2019 U.S. Dist. LEXIS 29085 at *16; *See Duty v. Comm'r of Soc. Sec.,* 2018 U.S.

Dist. LEXIS 159013, 2018 WL 4442595 at *6 (S.D. Ohio Sept. 18, 2018) ("existing case law controls to the extent it is consistent with the clarification of the rules embodied in SSR 16-3p's clarification.").

Reversal of the Commissioner's decision based upon error in a credibility/consistency determination requires a particularly strong showing by a plaintiff. *Whicker-Smith*, 2019 U.S. Dist. LEXIS at *16-17. Like the ultimate non-disability determination, the assessment of subjective complaints must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997). Further, a credibility/consistency determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Thus, it is proper for an ALJ to discount the claimant's testimony when there are inconsistencies and contradictions among the medical records, her testimony, and other evidence. *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 392 (6th Cir. 2004).

Here, the ALJ questioned the persuasiveness of Bryant's testimony related to caring for her son and doing household chores. This part of the ALJ's decision would have been better if she had contemporaneously cited evidence from the record supporting her skepticism of Bryant's statements. However, the court is required to show deference to the ALJ's assessment of Bryant's testimony. It was she who was tasked with considering Bryant's statements and assigning weight to them in light of all the evidence. The ALJ said that she was not persuaded by Bryant's statements. But, as already indicated, the ALJ did not only rely on her assessment of Bryant's daily activities alone to support her decision. The ALJ also noted that Bryant had received conservative treatment, was not taking narcotic-strength pain medications, and had even

stopped taking her medications at one point. (Tr. 20-21). These are appropriate facts to consider. Bryant has not cited a compelling reason that would justify overturning the ALJ's assessment of her ADL statements. Even if the court did not agree with the ALJ's assessment of Bryant's statements regarding her ADL's, the ALJ's subjective symptom assessment was supported by other substantial evidence in the record. In short, the ALJ's handling of the evidence provides no basis for reversal.

## VI.    Conclusion

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Bryant's application for disability insurance benefits is AFFIRMED.

Dated: November 1, 2019

Thomas M. Parker
United States Magistrate Judge